AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)

LODGED
CLERK, U.S. DISTRICT COURT

9/15/2020

CENTRAL DISTRICT OF CALIFORNIA
BY: ____ ᵖ ____ DEPUTY

# UNITED STATES DISTRICT COURT

for the

Central District of California

FILED
CLERK, U.S. DISTRICT COURT

September 15. 2020

CENTRAL DISTRICT OF CALIFORNIA
BY: ___ MR ___ DEPUTY

United States of America

v.

HOWARD SHAVELL SPENCER,

Defendant(s)

Case No.    2:20mj4384-Duty

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of July 30, 2019, in the county of Los Angeles in the Central District of California, the

defendant(s) violated:

|            Code Section            |            Offense Description            |
| ---------------------------------- | ----------------------------------------- |
| 21 U.S.C. § 841(a)(1)              | Distribution of Controlled Substance      |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

*/s/ Angelica Childs*
*Complainant's signature*

Angelica Childs, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R   rim P  4 1  , . 1 , hone.

Date:            9/15/2020

*Judge's signature*

City and state:   Los Angeles, California

Hon. Pedro V. Castillo, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT

I, Angelica Childs, being duly sworn, declare and state as follows:

### I. PURPOSE OF AFFIDAVIT

1.   This affidavit is made in support of a criminal complaint and arrest warrant against Howard Shavell SPENCER ("SPENCER") for a violation of 21 U.S.C. § 841(a)(1), (b)(1)(C) (distribution of cocaine base).

2.   This affidavit is also made in support of an application for a warrant to search:

    a.   The premises located at 645 East 95th Street, Los Angeles, California, 90002-1914, as described further in Attachment A-1 ("SUBJECT PREMISES 1");

    b.   The premises located at 914 East 90th Street, Los Angeles, California, 90002, as described further in Attachment A-2 ("SUBJECT PREMISES 2");

    c.   A white Kia[1] bearing California license plate number 7RFZ294, as described further in Attachment A-3 (the "SUBJECT VEHICLE");

    d.   The person of SPENCER, as described further in Attachment A-4; and

    e.   The person of Renae Lynnet BRIDGES ("BRIDGES"), as described further in Attachment A-5.

---

[1] Based on surveillance of the SUBJECT VEHICLE, DEA agents believe that the model of the SUBJECT VEHICLE is a Kia Forte. However, agents have been unsuccessful in attempts to confirm the exact model of the SUBJECT VEHICLE.

3.     The requested search warrants seek authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (distribution of, and possession with intent to distribute, controlled substances) and 21 U.S.C. § 846 (conspiracy and attempt to distribute controlled substances) (the "Subject Offenses"), as described more fully in Attachment B.  Attachments A-1, A-2, A-3, A-4, A-5, and B are incorporated herein by reference.

4.     The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrant, and search warrants and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II.  <u>BACKGROUND OF AFFIANT</u>

5.     I am a Special Agent with the United States Department of Justice, Drug Enforcement Administration ("DEA"), and have been so employed since August 2019.

6.     I have received and completed formal training that included a 16-week DEA training program in Quantico, Virginia, including specialized training in the investigation of major narcotics trafficking organizations.  I have participated in the debriefing of defendants and informants who had personal

knowledge regarding major narcotics trafficking organizations.
Additionally, I have participated in many aspects of drug
investigations, such as extensive hours of conducting
surveillance.  Through my training and experience, I am familiar
with narcotics traffickers' methods of operation, including the
manufacture, storage, transportation, and distribution of
narcotics, the collection of money that represents the proceeds
of narcotics trafficking, and money laundering.  I am also
familiar with the sophisticated methods that drug organizations
use to avoid detection by law enforcement.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

7.    In July 2019, the Los Angeles Police Department
("LAPD"), Bureau of Alcohol, Tobacco, Firearms and Explosives
("ATF"), and DEA began working on an investigation of drug
trafficking in the Watts neighborhood of Los Angeles.  Over the
course of that investigation, a Confidential Source (the "CS")[2]
made multiple controlled purchases of cocaine base from SPENCER
at SUBJECT PREMISES 1.  Specifically, the CS purchased what DEA
laboratory testing confirmed to be a mixture and substance
containing crack cocaine from SPENCER at SUBJECT PREMISES 1 on

---

[2] The CS has been an active informant for ATF since January
26, 2011.  The CS has worked on several cases with ATF
conducting hundreds of controlled purchases of firearms and
narcotics and has introduced several undercover ATF agents to
individuals engaged in illegal firearms and narcotics
trafficking.  The CS has testified as a witness for the
government in several federal and state cases leading to the
convictions of several defendants in the Los Angeles area.  The
CS has also worked in a similar capacity for several other
federal/local law enforcement agencies over the past 25 years.
The CS has been paid a total of approximately $69,000 for
his/her services.

the following occasions and in the following approximate
amounts: July 30, 2019 (0.7 grams); August 13, 2019 (2.561
grams); September 4, 2019 (5.16 grams); September 11, 2019
(6.556 grams); and October 16, 2019 (5.446 grams).

8.    During the August 13, 2019 drug transaction, SPENCER
told the CS that he did not have the amount of crack cocaine
that the CS requested and told the CS that a woman was on her
way with the drugs.  Law enforcement saw BRIDGES, driving the
SUBJECT VEHICLE, pull up to SUBJECT PREMISES 1.  BRIDGES then
walked into SUBJECT PREMISES 1, asked SPENCER for a plate, and
went into a bedroom with SPENCER.  SPENCER eventually left the
bedroom with BRIDGES and sold the CS cocaine base.  Further,
just ten minutes before the October 16, 2019 drug transaction,
law enforcement saw BRIDGES drive up to SUBJECT PREMISES 1 in
the SUBJECT VEHICLE, enter the SUBJECT PREMISES 1 for a short
time, and depart.  BRIDGES is the registered owner of the
SUBJECT VEHICLE and law enforcement databases list her address
as SUBJECT PREMISES 2.

### IV. <u>STATEMENT OF PROBABLE CAUSE</u>

9.    Based on my review of law enforcement reports and
field notes, and my discussions with other law enforcement
officers, I know the following:

### A.    SPENCER sells the CS approximately 0.7 grams of Crack Cocaine at SUBJECT PREMISES 1

10.  On July 30, 2019, DEA agents and the CS traveled to
South Avalon Boulevard, near East 98th Street, in Los Angeles in
an effort to contact drug dealers and make controlled purchases

from them.  Agents searched the CS and his/her vehicle for currency and contraband with negative results.  The CS was then provided devices to covertly audio and video record the planned controlled purchase, as well as $60 in official funds.

a.   At approximately 1:50 p.m., investigators established surveillance in the area of East 98th Street and South Avalon Boulevard, Los Angeles, California.  At approximately 2:00 p.m., law enforcement escorted the CS to the same area.  The CS then began talking to unidentified individuals in the area to attempt a purchase of crack cocaine. The CS was not successful at that location.

b.   At approximately 2:17 p.m., the CS made contact with an unidentified male, who called himself "Steve," in the vicinity of East 97th Street and South Avalon Boulevard in hopes that Steve would be able to purchase crack cocaine for the CS. Steve was also initially unsuccessful.

c.   At approximately 2:23 p.m., Steve advised the CS that there was a location on East 95th Street that would sell drugs to him/her.  The CS then followed Steve to SUBJECT PREMISES 1.

d.   At approximately 2:30 p.m., the CS and Steve arrived at SUBJECT PREMISES 1.  The CS met a male in the driveway, later identified as SPENCER, who introduced himself as "Pook" or "Pookie."  The CS and Steve then walked to the back yard, where the CS purchased approximately 0.7 grams of crack cocaine from SPENCER for $50 at the back door of SUBJECT PREMISES 1.  The CS asked SPENCER for a way to contact him in

5

the future.  SPENCER then provided the CS with a business card including his telephone number, 323-534-2849, and stated "that's me."

   e.   At approximately 2:34 p.m., the CS exited the SUBJECT PREMISES 1, returned to his/her car, and was escorted back to the LAPD Station.  Agents took possession of the drug exhibit and searched the CS and the CS's vehicle for contraband with negative results.[3]  A later DEA laboratory analysis of the drugs confirmed it to be approximately 0.715 grams of cocaine base.

   f.   Subsequent law enforcement database searches showed SPENCER to be a resident of SUBJECT PREMISES 1. SPENCER's California Department of Motor Vehicles ("DMV") photograph matched the covert recording of the individual who sold the drugs to the CS.  Additionally, on August 1, 2019, ATF agents met with the CS and showed him/her a six-pack photo lineup.  The CS positively identified SPENCER as the individual who sold him/her the crack cocaine on July 30, 2019.

   **B.   Additional Controlled Purchases of Crack Cocaine from SPENCER--On Two Occasions, Supplied by BRIDGES.**

   11.   On August 13, 2019, DEA agents and the CS again traveled to SUBJECT PREMISES 1 in an effort to make a controlled purchase from SPNECER.  Agents searched the CS and his/her

---

   [3] Agents generally followed this pre- and post-deal procedure for each of the controlled purchases discussed in this affidavit, each of which were audio and video recorded, with the exception of two transactions that took place on September 11, 2019 and October 16, 2019.  Technical difficulties resulted in the absence of audio/video recordings for these two transactions.

vehicle for currency and contraband with negative results.  The CS was then provided devices to covertly record the planned controlled purchase, as well as $500 in official funds.

a.   At approximately 3:15 p.m., investigators established surveillance in the area of SUBJECT PREMISES 1.  At approximately 3:18 p.m., law enforcement escorted the CS to the same area.  The CS subsequently parked in the vicinity of SUBJECT PREMISES 1.

b.   At approximately 3:25 p.m., the CS made contact with SPENCER at SUBJECT PREMISES 1. The CS asked SPENCER for $440 worth of drugs and SPENCER asked that the CS return to the residence in forty-five minutes to purchase the drugs.

c.   At approximately 4:39 p.m., the CS returned to SPENCER's residence and SPENCER told him/her that an unidentified female was on the way to the residence with the drugs.  Shortly after, the SUBJECT VEHICLE arrived at the SUBJECT PREMISES 1.[4]  LAPD Detective Dominguez observed the CS, SPENCER, and the unidentified female who exited the car, later identified as BRIDGES, go into SUBJECT PREMISES 1.  In a subsequent debriefing, the CS stated that once the three of them walked into SUBJECT PREMISES 1, SPENCER and BRIDGES walked to the kitchen.  BRIDGES asked for a plate, and then both BRIDGES and SPENCER went into the bedroom, out of sight of the CS.

---

[4] The SUBJECT VEHICLE was also seen earlier in the afternoon at SUBJECT PREMISES 1. A female, later identified as BRIDGES, was observed entering the SUBJECT PREMISES 1 before the CS purchased drugs from SPENCER. BRIDGES was observed by law enforcement exiting SUBJECT PREMISES 1 and departing the area in the SUBJECT VEHICLE only to be seen later in the afternoon, returning to SUBJECT PREMISES 1 to complete the drug deal.

SPENCER then returned from the bedroom alone and sold the crack cocaine to the CS.

   d. At approximately 4:44 p.m., the CS purchased $150 worth of drugs from SPENCER.  Subsequently, the CS returned to his/her car, and was escorted back to the LAPD Station.

   e. Based on my training and experience, and the proximity in time between BRIDGES's arrival and SPENCER's distribution of crack cocaine to the CS, I believe that BRIDGES supplied SPENCER with the crack cocaine that he eventually distributed to the CS.

   f. At approximately 4:47 p.m., after the CS had left, Detective Dominguez observed BRIDGES leave SUBJECT PREMISES 1 in the SUBJECT VEHICLE.  Surveillance units followed the SUBJECT VEHICLE and at 4:51 p.m., DEA agents observed the SUBJECT VEHICLE park at SUBJECT PREMISES 2.

   g. A later DEA laboratory analysis of the drugs purchased by the CS on August 13, 2019, confirmed it to be approximately 2.561 grams of cocaine base.

  12. On September 4, 2019, at approximately 11:55 a.m., the CS placed a call to SPENCER and discussed meeting around 1:30 p.m. to buy $300 worth of crack cocaine.  DEA agents and the CS traveled to SUBJECT PREMISES 1 in an effort to make a controlled purchase from SPENCER.  Agents searched the CS and his/her vehicle for currency and contraband with negative results.  The CS was then provided devices to covertly record the planned controlled purchase, as well as $300 in official funds.

a. At approximately 1:40 p.m., investigators established surveillance in the area of SUBJECT PREMISES 1. At approximately 1:50 p.m., law enforcement escorted the CS to the meet location. The CS subsequently parked in the vicinity of SUBJECT PREMISES 1.

b. Shortly after the CS arrived near the SUBJECT PREMISES 1, the CS entered SUBJECT PREMISES 1, purchased suspected crack cocaine from SPENCER, and left.

c. At approximately 1:56 p.m., the CS returned to his/her car, and was escorted back to the LAPD Station. Agents took possession of the drug exhibit and searched the CS and the CS's vehicle for contraband with negative results. Subsequent DEA laboratory analysis identified the drug exhibit to be approximately 5.16 grams of cocaine base.

d. At a subsequent debrief, the CS stated that the CS knocked on the front door of SUBJECT PREMISES 1, did not see SPENCER, knocked on the side door, and then SPENCER opened the side door to let the CS inside. The CS placed his/her buy money on the bed and SPENCER grabbed a bag of drugs from the nightstand next to the bed. SPENCER then handed the CS the drugs, picked up the money from the bed, and placed the money on the nightstand.

13. On September 11, 2019, DEA agents and the CS traveled to SUBJECT PREMISES 1, in an effort to make a controlled purchase from SPNECER. Through a series of recorded phone calls with SPENCER on September 10 and 11, 2019, the CS arranged to meet with SPENCER around 2:00 p.m. on September 11 to buy crack

9

cocaine.  Agents searched the CS and his/her vehicle for currency and contraband with negative results.  The CS was then provided devices to covertly record[5] the planned controlled purchase, as well as $1,000 in official funds.

a.   At approximately 1:05 p.m., law enforcement established surveillance in the area of the SUBJECT PREMISES 1. At approximately 1:23 p.m., law enforcement observed BRIDGES depart SUBJECT PREMISES 1 in the SUBJECT VEHICLE.  Law enforcement followed the SUBJECT VEHICLE and saw it park at SUBJECT PREMISES 2.

b.   At approximately 2:15 p.m., investigators established surveillance in the area of the SUBJECT PREMISES 1. At approximately 2:17 p.m., law enforcement escorted the CS to the meet location.  The CS subsequently parked in the vicinity of SUBJECT PREMISES 1.

c.   At approximately 2:26 p.m., the CS approached the SUBJECT PREMISES 1.   The CS stated that upon arriving, SPENCER didn't answer the front door.  The CS then heard SPENCER yell from the back, so the CS proceeded to walk towards the backyard. The CS saw SPENCER standing near the back door.  The CS told SPENCER that s/he had $1,000 to spend. SPENCER told the CS that he only had $300 worth of drugs ready, but he had more in powder form and could cook it up.  The CS told SPENCER that s/he would take $300 worth of crack now and shortly thereafter, SPENCER called the CS inside and handed him/her the crack.

---

[5] As stated above, this September 11, 2019 transaction was not audio/visually recorded due to technical difficulties.

d.    At approximately 2:38 p.m., the CS returned to his/her car with approximately suspected crack cocaine, and was escorted back to the LAPD Station.  Agents took possession of the drug exhibit and searched the CS and the CS's vehicle for contraband with negative results

e.    Subsequent DEA laboratory analysis identified the drug exhibit to be approximately 6.556 grams of cocaine base.

14.   On October 16, 2019, DEA agents and the CS traveled to SUBJECT PREMISES 1 in an effort to make another controlled purchase from SPENCER.  Through a series of recorded phone calls with SPENCER on October 15 and 16, 2019, the CS arranged to meet with SPENCER in the afternoon on October 16, 2019 to buy crack cocaine.  Agents searched the CS and his/her vehicle for currency and contraband with negative results.  The CS was then provided devices to covertly record the planned controlled purchase,[6] as well as $300 in official funds.

a.    At approximately 3:22 p.m., investigators established surveillance in the area of SUBJECT PREMISES 1. Shortly after, law enforcement saw BRIDGES arrive alone at SUBJECT PREMISES 1 in the SUBJECT VEHICLE.  BRIDGES got out of the SUBJECT VEHICLE and walked into the SUBJECT PREMISES 1.  At approximately 3:27 p.m., law enforcement saw BRIDGES leaving SUBJECT PREMISES 1 in the SUBJECT VEHICLE.

b.    At approximately 3:29 p.m., law enforcement escorted the CS to the meet location.  The CS subsequently

---

[6] Again, as stated above, the October 16, 2019 transaction was not audio/visually recorded due to technical difficulties.

parked near SUBJECT PREMISES 1.  The CS approached the front
door of SUBJECT PREMISES 1 and then subsequently walked around
through the side gate to the backyard of SUBJECT PREMISES 1.
Upon arriving at SUBJECT PREMISES 1, SPENCER didn't answer the
door, so the CS placed a call to him.  SPENCER told the CS that
he was in the bathroom so the CS waited in the backyard.
Shortly after, SPENCER went to the backdoor and asked the CS how
much s/he wanted.  The CS said he wanted $300 worth of crack
cocaine.  A few minutes later, SPENCER called the CS into the
house once the crack cocaine was ready.  SPENCER then provided
the CS with the crack cocaine.

         c.   Based on my training and experience, and the
proximity in time between BRIDGES's arrival and SPENCER's
distribution of crack cocaine to the CS, I believe that BRIDGES
again supplied SPENCER with the crack cocaine that he eventually
distributed to the CS.

         d.   At approximately 3:46 p.m., the CS returned to
his/her car and was escorted back to the LAPD Station.
Subsequent DEA laboratory analysis identified the drug exhibit
to be approximately 5.446 grams of cocaine base.

         **C.   Searches of Law Enforcement Databases and Recent
              Surveillance Establish that SPENCER and BRIDGES
              Currently Reside at SUBJECT PREMISES 1 and 2,
              Respectively, and BRIDGES Is the Registered Owner of
              the SUBJECT VEHICLE.**

    15.   Through law enforcement database findings, it has
been determined that the SUBJECT VEHICLE is registered to
BRIDGES at SUBJECT PREMISES 2.  Furthermore, DEA agents

conducting surveillance at SUBJECT PREMISES 2 on July 15, 2020, approximately 11:21 a.m., saw BRIDGES enter SUBJECT PREMISES 2.

16.  On August 6, 2020, the Honorable Alicia Rosenberg, United States Magistrate Judge, issued a warrant in case number 2:20-MJ-03680, authorizing the GPS monitoring of SPENCER's cellular phone associated with his number, 323-534-2849.  Each day during the 30-day GPS monitoring of SPENCER's phone in August and September 2020, pings reflected the phone's location as SUBJECT PREMISES 1.

17.  Further, on August 11, 2020, from 5:00 p.m. to 6:30 p.m., GPS data showed that SPENCER's phone traveled to the vicinity of SUBJECT PREMISES 2.

## V.   TRAINING AND EXPERIENCE ON DRUG OFFENSES

18.  Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

a.   Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds.  Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

b.   Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of

illegal drugs.  The aforementioned records are often maintained where drug traffickers have ready access to them, such as on their cell phones and other digital devices, and in their residences.

c.    Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.  In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

d.    Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices and in their residence.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices and in their residence, including in the form of calendar entries and location data.

e.    Drug traffickers often use vehicles to transport their narcotics and may keep stashes of narcotics in their vehicles in the event of an unexpected opportunity to sell narcotics arises.

14

f. Drug traffickers often maintain on hand large amounts of United States currency in order to maintain and finance their ongoing drug trafficking businesses, which operate on a cash basis. Such currency is often stored in their residences and vehicles.

g. Drug traffickers often keep drugs in places where they have ready access and control, such as at their residence or in safes. They also often keep other items related to their drug trafficking activities at their residence, such as digital scales, packaging materials, and proceeds of drug trafficking. These items are often small enough to be easily hidden and thus may be kept at a drug trafficker's residence even if the drug trafficker lives with others who may be unaware of his criminal activity.

h. It is common for drug traffickers to own multiple phones of varying sophistication and cost as a method to diversify communications between various customers and suppliers. These phones range from sophisticated smart phones using digital communications applications such as Blackberry Messenger, WhatsApp, and the like, to cheap, simple, and often prepaid flip phones, known colloquially as "drop phones," for actual voice communications.

## VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

19. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and

who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

20.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

17

21.   The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.   The person who is in possession of a device or has the device among his or her belongings is likely a user of the device.  Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that

18

appears to have a biometric sensor and falls within the scope of the warrant: (1) depress SPENCER's or BRIDGES's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of SPENCER's or BRIDGES's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

22.   Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. <u>CONCLUSION</u>

23.   For all the reasons described above, there is probable cause to believe that SPENCER violated 21 U.S.C. § 841(a)(1), (b)(1)(C) (Distribution of Cocaine Base).   Further, there is probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of violations of the Subject Offenses will be found at or in SUBJECT PREMISES 1, SUBJECT PREMISES 2, the SUBJECT VEHICLE, the person of SPENCER, and the person of BRIDGES, as described in Attachments A-1, A-2, A-3, A-4, and A-5, respectively.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this __15__ day of
September, 2020.

_____
HONORABLE PEDRO V. CASTILLO
UNITED STATES MAGISTRATE JUDGE